UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| GREG LEEB, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:17-cv-02780-SRC |
| CHARTER COMMUNICATIONS, INC. *doing business as* SPECTRUM | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on plaintiff Greg Leeb's motion to compel discovery responses (ECF 80), Defendant Charter Communication, Inc.'s motion to compel discovery response (ECF 115), and Leeb's motion to compel discovery responses and for sanctions (ECF 120). For the reasons stated below, this Court will **GRANT** Leeb's motions (ECF 80, 120) and **DENY** Charter's motion (ECF 115).

## I. BACKGROUND

This case involves class-wide allegations by Leeb that he and others like him were contacted by Charter without consent via an automatic telephone dialing system (ATDS) and/or an "artificial or prerecorded voice" in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A). These non-consensual calls to people like Leeb, who are not customers of Charter, have been referred to as "wrong-number calls." The facts of this case are more fully stated in *Leeb v. Charter Communications, Inc.*, 2019 WL 144132 (E.D. Mo. Jan. 9, 2019).

1

Multiple discovery-related disputes have emerged in this case, resulting in myriad motions to compel. All share a common thread, however: the production of Charter's records, and Leeb's analytical methodologies, used to determine the class-wide scope of wrong-number calls made by Charter. The parties' continuous disagreement about discovery has also resulted in their filing of a joint motion to extend the deadlines of the Third Case Management Order. (ECF 105). That particular motion will not be taken up here, but suffice it to say that the parties mostly cite issues with discovery as the reason animating their request for a fourth case management order.

The undersigned was assigned to this case on July 16, 2019. To marshal together all pending discovery issues for expedited resolution, this Court ordered the parties to meet and confer on "any outstanding discovery issues" and to jointly file a two-page summary of each pending discovery motion. They did so (ECF 119), but the parties also filed two more motions to compel (one requesting sanctions) nearly simultaneously therewith. (ECF 115, 120). On September 4, 2019, a hearing was held to discuss "any outstanding discovery issues, any contested issues needing resolution, and the formulation of a plan for expediting all remaining discovery in the case." (ECF 110, 122). Today, the Court resolves the multitude of motions to compel in order to reach—in the near future—the separate but related issue of litigation deadlines.

## II. ANALYSIS

### A. Leeb's Motion to Compel Certain Responses to his Second Set of Discovery Requests (ECF 80)

Leeb's first motion is a follow-up to an early set of discovery requests that were partially denied by Judge White this past January. *See Leeb*, 2019 WL 144132. After Judge White's Order, Leeb filed a second set of discovery requests attempting to clean up many of the reasons his discovery requests were deemed overly broad and "not relevant to the scope of allegations in [the] case." *Id*. at *2. Leeb's motion follows after Charter, again, objected to the scope and vagueness of several of Leeb's second set of requests. In the joint summary brief, Leeb laid out his pending discovery requests as follows:

> Plaintiff's second motion to compel, Dkt. No.80, has been pending since April 24, 2019. In that motion, Plaintiff asked the Court to compel Charter to produce the following:
>
> 1. **Wrong Number or Not?** Charter contends that some of the "wrong number" codes in its systems were incorrect. Plaintiff issued discovery asking which of its records Charter believes to be incorrect, and what evidence supports or refutes this:
>
>> **Interrogatory No. 1 (2d Set).** If you contend that any cell phone number you or any third party on your behalf called after it had been logged as a "wrong number" actually belonged to a customer of yours, please state such phone number(s) and identify what documents or data support or refute such contention.
>>
>> **Request for Production No. 8 (2d Set).** All documents that support or refute any contention related to Interrogatory No. 1 above.
>>
>> **Request for Production No. 9 (2d Set).** All inbound call data, payment data, and other types of documents or data that support or refute the notion that cell phone numbers you called after such phone numbers were logged as a "wrong number" were actually customers' cell phone numbers.
>
> 2. **Wrong Number Complaints.** Judge White previously found that consumer complaints may be relevant to willfulness, Dkt. 69, Order at 3-4, but denied an earlier motion to compel finding the earlier request too broad. The reissued request is specifically tailored to the issues in this case: debt collection calls to non-customers or people who asked not to receive calls:

> **Request for Production No. 1 (2d Set)**. All complaints of any kind concerning outbound [debt collection] telephone communications to non-customers.
>
> **Request for Production No. 2 (2d Set)**. All complaints of any kind concerning outbound [debt collection] telephone communications to persons who had previously asked for communications to cease.
>
> 3. **Wrong Number-Related Communications and Documents.** These requests are narrowed versions of requests Judge White found to be too broad. Dkt. 69, Order at 4.
>
> > **Request for Production No. 3 (2d Set).** All communications and other documents of any kind concerning debt collection calls to "wrong numbers" or non-customers.
> >
> > **Request for Production No. 4 (2d Set).** All communications and other documents of any kind concerning determining whether consumer assertions of "wrong numbers" were correct.
> >
> > **Request for Production No. 5 (2d Set).** All communications and other documents of any kind concerning outbound telephone communications to persons who had previously asked for communications to cease.
> >
> > **Request for Production No. 6 (2d Set).** All policies, practices, and procedures relating to the calling of wrong numbers.
> >
> > **Request for Production No. 7 (2d Set).** All documents relating to determining what phone numbers are properly associated with customers, and which are not.

(ECF 119, pp. 1-2). As the three topics make clear, all of the requests share the common thread of seeking information that establishes whether Charter was calling people without consent. Charter's objections, however, point out that the requests—as written—would: (1) impose "a staggering, disproportionate burden" of production because the requests are not tied to a reasonable sample size—forcing Charter to respond to "hundreds of thousands of instances" of "wrong number" calls; and (2) seek irrelevant information,

4

pertinent neither to the claims nor defenses of the case, in that the requests are generically described and "not limited to the class allegations." The Court evaluates these criticisms individually.

> ### *i. The Sampling Size Issue—Limiting Production to a Reasonable Set of Records for Purposes of Class Certification*

This Court notes the parties' efforts to agree upon a two-stage sampling of Charter's records to limit the otherwise vast scope of production. They suggest Charter could "provide a random sample of unredacted outbound calling records for 2,000 unique telephone numbers" (the "Sample of 2,000") and "within the sample of 2,000 described above, [another] sub-sample of [] accounts"—a so-called "deep dive"—"[that includes] certain [additional] account-level records [beyond outbound calls]." (the "Deep-Dive Sample") (ECF 119, p. 3). The parties disagree on the exact sample size to be used for this "deep dive." Leeb requests a sample size of 500, whereas Charter believe a sample size as small as 75 would suffice.

Courts do, in fact, regularly employ a sampling-type system to narrow production burdens, yet still allow effective analytical evaluation regarding whether class-wide claims can be supported—these samplings vary in size, however. *See, e.g., Hunter v. Time Warner Cable, Inc.*, 2019 WL 3812063 at *2, *5 (S.D.N.Y. Aug. 14, 2019) (sampling of 10,000 telephone numbers); *Bridge v. Credit One Financial*, 294 F.Supp.3d 1019, 1031 (D. Nev. 2018) (sampling of 500 telephone numbers). *West v. California Servs. Bureau, Inc.*, 323 F.R.D. 295, 304 (N.D. Cal. 2017) (sampling size of 9,461 phone

5

numbers). The Court will utilize this system given the parties' general agreement about its use in this case.

However, the Court declines the two-stage system urged by the parties for two reasons. First, it unnecessarily complicates impending expert analyses. Charter points to the Southern District of New York's recent opinion in *Hunter* while arguing this Court can rely on a sample size as small as 75 in deciding class certification. Charter misreads *Hunter*. The sampling size used in that case was 10,000. And from that sample, the defendant utilized an expert to show that a random sub-sampling of 75 (of the 10,000) showed an error rate near 86%, meaning "[defendant] persuasively demonstrated that [plaintiff's expert's] methodology is incapable of accurately and reliably identifying a class of individuals that have received wrong-number calls." *Hunter*, 2019 WL 3812063, at *5, *12. That is a different situation entirely from the parties' proposal, here, to create two sampling sets, with two different magnitudes of document production, which may lead to confusion as experts draw conclusions from both sampling sets undergirded by dissimilar evidentiary support. It makes more sense to have one, uniform sampling set that everyone works from.

Second, production of the so-called Deep-Dive Sample will inevitably include personal identifying information at a scale different than what is contemplated in the Sample of 2,000. This Court will soon issue an Order regarding production of "personally identifiable information" by Charter under 47 U.S.C. § 551. Part of that Order will involve notification to affected persons about the type of information to be disclosed by Charter. *Id.* at § 551(c)(2)(B) (providing that a cable operator may disclose personally

identifiable information pursuant to a court order authorizing such disclosure "if the subscriber is notified of such order by the person to whom the order is directed"). To streamline the notification process, it makes more sense to utilize a single sample size that has a single magnitude of record production.

Accordingly, to ensure Leeb has sufficient data for which to attempt to create a sound analytical methodology, and to ensure Charter is not overly burdened in its production requirements—and noting, too, the age of this case and the parties' past conduct that calls for some measure of acceleration to keep the parties on track—the Court orders that the sampling size will be a relatively modest 750 accounts. The 750-account sample shall include, as Charter describes it, "universal account-level records," meaning: vendor records; "New Star Scoring" records; any recorded conversations; records regarding dummy numbers or otherwise including codes and/or free form notes tending to show that a wrong number has been reached; inbound call logs; and inbound payment records.

### ii. *The Class Allegations Issue—Limiting Production to Records Responsive to the Claims and Defenses of the Case.*

Even with a thoroughly-supported sample of 750 accounts, which will provide an opportunity to test the extent of wrong-number calls at a manageable micro level, Leeb will still need to marshal his class members. A plaintiff "need not be able to identify all class members at class certification," *City Select Auto Sales, Inc. v. BMW Bank of North America, Inc.*, 867 F.3d 434, 439 (3d Cir. 2017), but class-action notification follows soon thereafter with notification by mail being the preferred method—necessitating

identification of members whenever possible. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 296 (W.D. Tex. 2007) ("sending notice by mail is preferred when all or most of the class members can be identified"); *Sobel v. Hertz Corp.*, 2013 WL 5202027 at *5 (D. Nev. Sept. 13, 2013) (accord). Thus, it is important to consider Leeb's discovery requests beyond the sample-size production discussed above.

Again, one of Charter's complaints is that Leeb's requests are not limited to the claims and defenses of the case; that is, the requests—generalized as they are—do not track with the class allegations. Leeb's proposed class consists of:

> (a) All persons in the United States whose cellular telephone number, (b) on or after November 28, 2013, (c) Charter or someone on its behalf **called in connection with debt collection using** (1) an **unattended message**, (2) **TCN**, or (3) **LiveVox**, [and] (d) where Charter or any of its vendor's records show data indicating that the recipient was a non-customer, third party, wrong number, or asked for calls to stop.

(ECF 50, ¶ 57) (emphasis added). The bolded terms help give structure to the proposed class to ensure Leeb's particular harm is typical (and common) of the class as a whole—in essence, the specificity of the bolded terms mitigates against the possibility of "individualized inquires, such that [Leeb's] claims are not typical of the class." *Postawko v. Mo. Dept. of Corr.,* 910 F.3d 1030, 1039 (8th Cir. 2018) (noting factual variations in individual claims will not normally preclude class certification so long as the claims arise from the same event or course of conduct); *see also Abdeljalil v. General Elec. Capital Corp.*, 306 F.R.D. 303, 309 (S.D. Cal. 2015) (typicality satisfied where, among other things, class and lead plaintiff were all called for the purpose of debt collection using ATDS systems).

Given the age of this case and the need to push it in a positive direction towards trial, this Court agrees that further production—beyond the 750-account sample—should be tailored to the class allegations. In fact, Leeb has already agreed to limit some of his requests to "complaints of any kind concerning outbound ***debt collection*** telephone communications,"[1] and "all communications and other documents of any kind concerning ***debt collection*** calls"—to better track with the class allegations. Charter's criticisms that Leeb seeks "different types of calls than the one at issue," information "regarding different methods of calling [other than by the limitations in class allegation subsection (c)]," and documents "embrac[ing] entirely different fact patterns outside of the scope of this case" are ameliorated when each discovery request is further limited by the language of the class action allegations bolded above. Therefore, each discovery request will be limited to information pertaining to calls made "in connection with debt collection" using either "an unattended message," "TCN," or "LiveVox." That is, the universe of documents to be produced under category 2 (wrong number complaints) and category 3 (wrong number-related communications and documents) must be predicated on outbound debt collection calls made by Charter via unattended message, TCN, or LiveVox.

Category 1 (wrong number or not?) entails somewhat different considerations. Those discovery requests essentially ask Charter to identify the evidentiary basis for its allegation that some "wrong numbers" were, in fact, inaccurately coded as such; the

---

[1] RFP 1 and 2—seeking complaint-related documents—did not contain a "debt collection" limitation as originally drafted. That limitation was added in Leeb's briefing, essentially acknowledges the appropriateness of its narrowing effect.

requests are reactionary and have a pre-defined scope in that they are limited only to what Charter "contends" is a wrongly-coded number. The requests are, in essence, contention interrogatories. *See, e.g., Starcher v. Correctional Medical Systems, Inc.*, 144 F.3d 418, 421 n.2 (6th Cir. 1998) ("[C]ontention interrogatories are interrogatories that seek to clarify the basis or scope of an adversary's legal claims."). Necessarily, the universe of production is proportionately limited to those records that Charter would eventually seek to use in its defense during class certification. *See. e.g., Hunter*, 2019 WL 3812063 at *12 (considering defense's strategy to attack plaintiff's analytical methodologies via expert testimony that showed 86% "false-positive" rate for wrong-number matches). Contention interrogatories are, generally speaking, permissible under Rule 33(a). *Starcher*, 144 F.3d at 421 n.2 ("The general view is that contention interrogatories are a perfectly permissible form of discovery[.]"); *see also Machinery Solutions, Inc. v. Doosan Infracore America Corp.*, 323 F.R.D. 522, 528 (D.S.C. 2018) ("[I]nterrogatories which seek opinions or contentions that call for the application of law to fact are proper, and an interrogatory may properly inquire into a party's contentions in the case."); FED. R. CIV. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact"). Accordingly, Charter's position that production would be unduly burdensome is not well-taken when, in fact, Charter is likely to rely on the very same records it refuses to produce. To be sure, Charter has already admitted "***it [has] evidence of 'consent' for every number at issue*** … [and therefore] Charter maintains its defense that all phone numbers notated 'wrong

number' are presumptively 'right numbers.'" (ECF 83, p. 6 (emphasis added)). It should produce such evidence if it intends to rely on it.

### iii. *Conclusion*

To summarize, this Court will grant Leeb's motion to compel (ECF 80). However, Charter's production will be limited in the following ways:

(1) Charter will produce "universal account-level records" for 750 accounts drawn at random. Within five days of this Order, the parties must agree on the randomization procedure and notify the Court of the randomization method chosen. <u>The sampling will specifically include the following categories of documents</u>: vendor records (i.e. LiveVox, NetTel, TCN, and any other vendor providing unattended messages); "New Star Scoring" records; any recorded conversations; records regarding dummy numbers or otherwise including codes and/or free form notes tending to show that a wrong number has been reached; inbound call logs; and inbound payment records. <u>What shall not be included in the sampling</u> is any payment information and/or monthly statements, as well as customer viewing data such as television viewing habits or internet browsing history.

(2) Charter's objections are overruled and Charter must respond to each interrogatory and request for production in Categories 1 and 2, discussed above, with the added limitation that each request is narrowed to seek information or documents predicated on: (a) outbound debt collection calls; (b) that are made by Charter via unattended message, TCN, or LiveVox.

11

(3) Charter's objections are overruled and it is directed to respond to each interrogatory and request for production in Category 3 as originally written.

**B. Charter's Motion to Compel (ECF 115)**

Charter moves to compel Leeb's response to the following interrogatory:

**Interrogatory No. 1**: State the methodology by which Plaintiff will identify members of the proposed class, including but not limited to the individuals to whom Plaintiff will contend that Defendant is liable. Plaintiff's statement should include, at a minimum, an identification of the documents and data upon which Plaintiff intends to rely to identify members of the proposed class, including but not limited to any "reverse lookup" databases, "wrong number" notations, documents or data in the possession of third parties, affidavits, or other sources of information.

Though objecting because, among other things, "Charter has not produced any of the class discovery the Court ordered it to produce months ago on January 9, 2019," Leeb has explained that he plans—at least in part—to use "reverse-lookups" (such as Lexis) and carrier subpoenas (to various cell phone providers such as AT&T, Verizon, Sprint, and T-Mobile) to establish his analytical methodology. Charter seeks to lift Leeb's objections because it "completed its data production to Plaintiff as ordered by this Court (Judge White), producing logs of outbound calls placed by TCN and NetTel[.]" Leeb counters arguing Charter still "has [not] provided [Leeb] with information sufficient to provide a meaningful response."

The Court has already foreshadowed who has the better argument, here. Charter has been slow to produce meaningful documents to Leeb, thereby frustrating Leeb's efforts to formulate his analytical methodologies. The present Order will ensure Leeb has "universal account-level records" for 750 randomly-drawn accounts of Charter. After

12

Leeb has had some time to digest those records, Charter's argument may carry more weight. For now, however, that argument is premature.

But, another problem exists. As explained in more detail in Section C below, Charter has not, in fact, produced all of its records in satisfaction of Judge White's Order. To the contrary, Charter produced records for TCN and NetTel only, yet nowhere does Judge White's Order envision production limited to those two vendors. Having not yet complied with Judge White's Order—from more than 9 months ago—and having not yet produced many of the records requested by Leeb in his latest round of discovery, the Court finds that Charter's demand for methodology-type information is premature. The Court therefore denies Charter's motion.

### C. Leeb's Motion to Compel and for Sanctions (ECF 120)

Leeb's second motion to compel concerns the scope of production ordered by Judge White in January, 2019. Leeb says he recently discovered that Charter's "compete production," pursuant to Judge White's Order, is anything but. Instead, "Charter [] limited its production to data from particular vendors [TCN and NetTel]" when, in fact, "Judge White's Order directed Charter to produce call records for <u>all</u> 'accounts where there were automated calls to phone numbers logged as wrong numbers before the call was made.'" (emphasis in original). Disagreeing with that interpretation, Charter says Judge White actually narrowed production to the records it has produced in view that Leeb, prior to Judge White's Order, orally agreed to limit production to "information

13

from the two, third-party entities that actually called Plaintiff"—TCN and NetTel.[2]

Charter says Judge White adopted this oral limitation by reference in his Order.

Charter's argument is incorrect, and relies on an untenable interpretation of Judge White's Order, which reads in pertinent part:

> **Plaintiff has narrowed Interrogatory No. 1 to request that Charter produce account and call records for accounts where there were "automated calls to phone numbers logged as 'wrong number' before the call was made."** These automated calls are **unattended messages or calls made on the same dialer that called Plaintiff** and where Charter has a record indicating it reached a "wrong number." Plaintiff further requests information with respect to these calls including dialer information, communication data, recipients, call purpose, source of phone number, consent, absence of consent, caller ID, and dialer location. In RFP No. 2, Plaintiff requests all call detail information and associated data concerning Plaintiff and the persons and calls responsive to Interrogatory No. 1, including, inter alia, the telephone number called, the account number or other associated identifiers, identifying name, address, and other information.
>
> …
>
> The Court will grant Plaintiff's motion to compel with respect to Interrogatory No. 1 and RFT No. 2 only as to the names and cell phone numbers of putative class members and **as narrowed by Plaintiff and set forth in the first paragraph of subsection D of this Memorandum and Order**.

*Leeb*, 2019 WL 144132 at *3-4 (emphasis added).

The phrase "as narrowed by Plaintiff and set forth in the first paragraph of subsection D of this Memorandum and Order" refers to what it says, i.e. the Court's language in the first paragraph of subsection D. That paragraph in relevant part states:

---

[2] Charter has explained that LiveVox and NetTel are interchangeable for purposes of its production requirements in that "LiveVox [] maintains NetTel outbound calling data." (ECF 83, p. 4).

14

"Finally, Plaintiff has **narrowed** Interrogatory No. 1 to request that Charter produce account and call records for accounts where there were 'automated calls to phone numbers logged as 'wrong number' *before* the call was made." *Id*. at *3 (Citing ECF 56 [Plaintiff's Reply Brief] p. 1 (footnoted omitted)). In the footnote to that text, the Court quotes Interrogatory No. 1 "as originally submitted[.]" *Id*. at *3 n. 2. Continuing his discussion of the discovery at issue, Judge White then stated "the Court finds that the interrogatory [No. 1], **as narrowed above**, is within the scope of the class certification issue." *Id*. at *3 (citation omitted) (emphasis added).

Charter's interpretation of Judge White's Order relies solely on a "limit" that Leeb "agreed to in the meet-and-confer process[,]" (ECF 121) and the only place that proposed-but-not-accepted "limit" appears in the briefing on the motion to compel (ECF 45) is in Charter's opposition (ECF 51) to the motion. Judge White's discussion of the "narrowing" of Interrogatory No. 1 does not refer to Charter's opposition (ECF 51), and the only place the Court cites that opposition is in the Background section, in passing reference. *Id*. at *1. In the discussion about "narrowing," Judge White does, on the other hand, cite and quote Leeb's reply. *Id*. at *3 (citing and quoting ECF 56 at p. 1). Charter thus seeks to interpret Judge White's order: (1) not from the four corners of the order itself or from the documents cited in the relevant section of the order but from Charter's own brief (which the Court did not mention), and (2) by reference to a "limit" that Leeb proposed during the meet-and-confer process ***but that Charter rejected***—a noteworthy, yet missing, detail in Charter's

15

explanation.[3] At bottom, Charter's reliance on its own misinterpretation of Judge White's Order is no excuse. *See, e.g., Malautea v. Suzuki Motor Co., Ltd*., 987 F.2d 1536, 1543 (11th Cir. 1993) (willful violation of discovery orders found, and defendant's claimed misunderstanding of the orders rejected, where defendant failed to provide a "credible explanation of how it interpreted the discover orders not to encompass the [requested] information" and failed to seek clarification from the court to the extent there was confusion); *Atlas Resources, Inc. v. Liberty Mut. Ins. Co*., 297 F.R.D. 482, 493 (D.N.M. 2011) ("A party's disingenuously hypertechnical or purposefully obtuse interpretation of a discovery request can be sanctionable under the totality of the circumstances.").

Charter's incorrect interpretation aside, the fact is Judge White never indicated he was limiting Charter's production to vendors TCN and NetTel; to the contrary, he specifically explained that Leeb was seeking calls by "unattended messages **or** calls made on the same dialer that called Plaintiff." *Id*. at \*3 (emphasis added). To Charter's credit, the category of calls referenced after the disjunctive use of "or" could have limited production to TCN and NetTel—the vendors that actually called Leeb. But, then, that ignores the more generic request for automated calls using "unattended messages" that preceded the use of the conjunction "or." Moreover, Charter cannot, now, claim to be caught unaware of the scope of information sought in this case when the class allegations

---

[3] Charter had the opportunity to make that proposed limit the operative limit on discovery by accepting it, which would have avoided the need for Leeb to file a motion to compel. Charter chose not to do so.

have always contemplated three categories of calls: those debt-collection calls made "using (1) an unattended message, (2) TCN, or (3) LiveVox[/NetTel.]" (ECF 50, ¶ 57).

Simply put, Charter has failed to fully produce records as ordered by Judge White and, therefore, this Court grants Leeb's motion and once again directs Charter to respond to Leeb's discovery requests as set forth in Judge White's Order. Charter must do so by no later than **Friday, October 4, 2019**.

That leaves the issue of sanctions. This Court's "authority to sanction a party for its discovery misconduct flows from its inherent power to manage its own affairs so as to achieve the orderly and expeditious disposition of cases, including fashioning an appropriate sanction for conduct which abuses the judicial process." *HM Compounding Servs., LLC. v. Express Scripts, Inc.*, 349 F.Supp.3d 794, 799 (E.D. Mo. 2018). Pursuant to Rule 37, a district court has express authority to impose sanctions for discovery violations. *Id. (*citing *Nat'l Hockey League v. Metro Hockey Club, Inc.*, 427 U.S. 639, 642-643 (1976)). And, as relevant here, an "evasive or incomplete disclosure, answer, or response [is] treated as a failure to disclose, answer, or respond." FED. R. CIV. P. 37(a)(4).

As Rule 37(a)(4) contemplates, Charter has failed to respond to Leeb's discovery requests despite being ordered to do so. Beyond its unduly narrow misreading of Judge White's Order, Charter provides no other justification for which to avoid sanctions. In granting Leeb's motion, Rule 37(a)(5)(A) directs that Charter shall "pay the movant's reasonable expenses incurred in making the motion, including attorney's fees[.]" The Court hereby orders Charter to pay those expenses. Within five days of this Order, Leeb shall file an affidavit and any other supporting documentation showing the fees and costs

incurred in making the present motion to compel, ECF 120.[4] No later than five days after Leeb's submissions are due, Charter may file a brief in response of no more than four pages, if it disputes any of the specific fees and costs claimed by Leeb.

### III. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Greg Leeb's motion to compel discovery responses (ECF 80) is **GRANTED**. However, Charter's production will be limited in the following ways:

(1)  Charter will produce "universal account-level records" for 750 accounts drawn at random by no later than **Monday, November 25, 2019**. Within five days of this Order, the parties must agree on the randomization procedure and immediately notify the Court of the randomization method chosen. <u>The sampling will specifically include the following categories of documents</u>: vendor records (i.e. LiveVox, NetTel, TCN, and any other vendor providing unattended messages); "New Star Scoring" records; any recorded conversations; records regarding dummy numbers or otherwise including codes and/or free form notes tending to show that a wrong number has been reached; inbound call logs; and inbound payment records. <u>What shall not be included in the sampling</u> is any payment information and/or

---

[4] The Court is not awarding fees and costs relating to any other motion to compel.

monthly statements, as well as customer viewing data such as television viewing habits or internet browsing history.

(2) Charter's objections are overruled and it is directed to respond to each interrogatory and request for production in Categories 1 and 2, discussed above, by no later than **Friday, October 4, 2019**, with the added limitation that each request is narrowed to seek information or documents predicated on: (a) outbound debt collection calls; (b) that are made by Charter via unattended message, TCN, or LiveVox. To the extent Charter's responses implicate records to be produced in the 750-account sample discussed herein, Charter's discovery responses shall be supplemented under FRCP 26(e)(1) no later than November 25, 2019.

(3) Charter's objections are overruled and it is directed to respond to each interrogatory and request for production in Category 3 as originally written, by no later than **Friday, October 4, 2019**. To the extent Charter's responses implicate records to be produced in the 750-account sample discussed herein, Charter's discovery responses shall be supplemented under FRCP 26(e)(1) no later than November 25, 2019.

**IT IS FURTHER ORDERED THAT** Defendant Charter Communication, Inc.'s motion to compel discovery response (ECF 115) is **DENIED** without prejudice.

**IT IS FURTHER ORDERED THAT** Leeb's motion to compel discovery responses and for sanctions (ECF 120) is **GRANTED**. Charter is directed to respond to Leeb's discovery requests as set forth in Judge White's Order. Charter must do so by no

later than **Friday, October 4, 2019**. To the extent Charter's responses implicate records to be produced in the 750-account sample discussed herein, Charter's discovery responses shall be supplemented under FRCP 26(e)(1) no later than November 25, 2019. As sanctions for Charter's failure to comply with Judge White's discovery order, Charter shall pay the reasonable expenses incurred by Leeb. Within five days of this Order, Leeb shall file an affidavit and any other supporting documentation showing the fees and costs incurred in making the present motion to compel, ECF 120. No later than five days after Leeb's submissions are due, Charter may file a brief in response of no more than four pages if it disputes any of the specific fees and costs claimed by Leeb.

 So ordered this 20th day of September, 2019.

_____
STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE